# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-CA-00256-SCT

***ROBINSON PROPERTY GROUP, L.P.,
A MISSISSIPPI LIMITED PARTNERSHIP d/b/a
HORSESHOE CASINO AND HOTEL***

***v.***

***MARY S. MITCHELL***

| | |
|---|---|
| DATE OF JUDGMENT: | 01/14/2008 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOEANNA CHANDLEY CRAWFORD |
| | ROBERT LEWIS MOORE |
| | DAWN DAVIS CARSON |
| ATTORNEY FOR APPELLEE: | ROBERT Q. WHITWELL |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 04/23/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     Mary S. Mitchell filed a personal-injury suit against Robinson Property Group ("Robinson Property"), a Mississippi Limited Partnership, stemming from a trip-and-fall accident at the Horseshoe Casino in Robinsonville, Mississippi. A jury determined the value of Mitchell's damages at $80,000, but deemed her thirty percent at fault. Thus, final judgment was entered in her favor for $56,000. Finding no error, this Court affirms.

## FACTS

¶2. On March 29, 2006, Mitchell, a seventy-two-year-old resident of Memphis, Tennessee, and a group of her friends visited the Horseshoe Casino in Robinsonville, Mississippi. After playing the slot machines, Mitchell walked over to the snack bar and ordered a sandwich. While awaiting her order, Mitchell decided to play her one remaining "fifty-cent coupon" on a nearby slot machine. As Mitchell approached the machine, the heel of her shoe caught on a metal plate, causing her to fall. This metal plate had a two-inch lip and formed the base for attaching a slot-machine seat to the floor.

¶3. The parties dispute whether the area in which the accident occurred was barricaded. Mitchell stated that several aisles were roped off, but she did not see any barricades around this particular area. A companion, Bettie Jolly, testified that she did not see any barricades. Both women, however, did notice that the seats in this area were in some disarray. Robinson Property insisted that the area had been roped off, and that Mitchell had failed to notice, or had blatantly ignored, the barricade.

¶4. Mitchell was transported to the emergency room at Baptist Memorial Hospital-DeSoto in Southaven, Mississippi, and then transferred to Methodist Le Bonheur Germantown Hospital in Germantown, Tennessee. She suffered a broken ankle and underwent orthopedic surgery several days later.

¶5. Mitchell experienced additional complications from the injury. While hospitalized following her surgery, Mitchell contracted a staph infection in one eye and one arm. Thereafter, she was confined to a wheelchair for nearly six weeks. She described the pain as unbearable. Mitchell testified that she also had difficulty breathing and consulted both a

2

lung specialist and a heart specialist for treatment. Additionally, she received psychological treatment for depression. Mitchell also testified that she missed a substantial period of work, and that when she returned to work, her hours at a local gift shop were reduced from eight hours a day, three days a week, to four hours a day, three days a week, due to her inability to stand for prolonged periods of time.

¶6. Mitchell filed suit against Robinson Property in the Circuit Court of Tunica County, Mississippi, which culminated in a jury verdict in her favor. Contested issues at trial included, *inter alia*, whether the area was barricaded and the accuracy of Mitchell's purported medical expenses. Rather than submitting separate bills and records associated with her medical expenses, Mitchell offered a summary as evidence, thereby excluding documents which revealed Medicare payments. Attached to the summary was some supporting documentation. On cross-examination, Robinson Property confronted Mitchell regarding discrepancies between the summary and the attached bills. Robinson Property also pointed out that some of the bills failed to reflect the amount shown in the summary. Robinson Property contested whether attached bills for treatment of a urinary-tract infection, cholesterol check, routine blood work, and a $10,198 bill from the Sutherland Clinic which dated back to June 18, 1996, were related to the 2006 fall. Mitchell testified that she did not know how the inclusion of the Sutherland Clinic bill had occurred, as she had not seen the summary prior to taking the witness stand. Mitchell testified someone had made a mistake[1]

---

[1]At post-trial motion hearings, Mitchell's counsel explained that his office had flooded just prior to trial, and in his haste to obtain replacement copies of Mitchell's medical bills, he inadvertently included the entire bill from the Sutherland Clinic.

to include the entire bill, but that she had incurred some medical expenses at Sutherland Clinic attributable to the 2006 fall.  On redirect, it was established that Mitchell's counsel had prepared the summary, and Mitchell testified that any expense incurred at the Sutherland Clinic before her fall should be taken off her claim.  Mitchell sought special damages, including lost wages, of $43,383.

¶7.     After hearing all the evidence, the jury established Mitchell's total damages at $80,000 and deemed her thirty percent at fault.  Accordingly, the circuit court entered a final judgment in the amount of $56,000.  Mitchell then filed a motion for additur, which the circuit court denied.  Robinson Property filed a motion for new trial, asserting that the circuit court had erred in denying its motion for directed verdict and in refusing to allow impeachment of Mitchell regarding her assertion of financial devastation, relying on evidence it proffered during trial that a large portion of her medical expenses were paid by insurance.  After a post-trial hearing, the circuit judge entered an order denying Robinson Property's motion for new trial.

¶8.     Robinson Property now appeals to this Court, raising the following assignments of error: (1) whether the circuit court erred in refusing to recognize an impeachment exception to the collateral-source rule, and (2) whether the circuit court abused its discretion in failing to grant Robinson Property's motion for new trial.

## DISCUSSION

**I.      Whether the circuit court erred in refusing to recognize an impeachment exception to the collateral-source rule.**

¶9.      This Court reviews a trial judge's decision to admit or deny evidence under an abuse-of-discretion standard. *See* ***Whitten v. Cox***, 799 So. 2d 1, 13 (Miss. 2000) (quoting ***Floyd v. City of Crystal Springs***, 749 So. 2d 110, 113 (Miss. 1999)).  If an error involves the admission or exclusion of evidence, this Court "'will not reverse unless the error adversely affects a substantial right of a party.'" ***Id***.

¶10.     During the direct examination of Mitchell, the following exchange occurred:

> [Mitchell's attorney]: You have told the jury what expenses you have incurred. What are you asking the jury to give you in the way of compensation to compensate you for this injury?
>
> [Mitchell]: Well, I just want the jury to determine that, except I would like to have the medical bills and my expenses, and, of course, that's really just partial expenses.  I couldn't even think of everything that I have spent and the gas and the cost of everything, the going back and forth to physical therapy and all of that, but I think the jury would be fair in awarding whatever they feel would be right for something as serious as this.
>
> [Mitchell's attorney]: Do you think that ought to be a substantial sum of money, more than the $50,000 medical expenses you have?
>
> [Mitchell]: Well, I would hope so.  *I had to -- I borrowed money to live on.  I refinanced my house.  I know that's probably not a problem I'm supposed to bring up, but it has -- it's devastated me financially, too*.

(Emphasis added).  Additionally, the following exchange addressed Mitchell's lost wages:

> [Mitchell's attorney]: As a result of this, did you lose some time from work while you were off with all of this surgery and so forth?
>
> [Mitchell]: Oh, yes.  I didn't work again until – several months ago, I started back part-time . . . .  I work four hours three days a week, and that's about all I can stand on this ankle still, and it's been a year and a half . . . .

5

[Mitchell's attorney]: Are you able to work a full eight-hour day now?

[Mitchell]: No, not yet.

¶11.    Robinson Property argues that it sought to introduce evidence that the medical bills incurred by Mitchell were substantially paid by insurance for the purpose of impeaching her testimony, not to mitigate or reduce her damages.  Robinson Property contends that ***Busick v. St. John***, 856 So. 2d 304 (Miss. 2003), and ***Geske v. Williamson***, 945 So. 2d 429 (Miss. Ct. App. 2006), both recognized an impeachment exception to the collateral-source rule.  The circuit judge, however, denied Robinson Property's request, relying upon ***McCary v. Caperton***, 601 So. 2d 866 (Miss. 1992), and held that there was no impeachment exception to the collateral-source rule.

¶12.    It has long been established in our state that, under the collateral-source rule, "a defendant tortfeasor is not entitled to have damages for which he is liable reduced by reason of the fact that the plaintiff has received compensation for his injury by and through a totally independent source, separate and apart from the defendant tortfeasor." ***Cent. Bank of Miss. v. Butler***, 517 So. 2d 507, 511-12 (Miss. 1987) (citations omitted).  Compensation or indemnity received by the plaintiff from a collateral source such as insurance:

> cannot be set up by the [defendant] *in mitigation or reduction of damages . . . .*
>
> The wrongdoer is not entitled to have the damages to which he is liable *reduced* by proving that plaintiff has received or will receive compensation or indemnity for the loss from a collateral source, wholly independent of him. Under this general rule, insurance in behalf of the injured person cannot be set up the wrongdoer *in mitigation of the loss*.

*Coker v. Five-Two Taxi Serv.*, 211 Miss. 820, 826, 52 So. 2d 356, 357 (1951) (quoting 25

C.J.S. Damages, § 99) (emphasis added).  *See also **Burr v. Miss. Baptist Med. Ctr.**, 909 So.

2d 721, 728 (Miss. 2005).

¶13.   Prior to *Busick*, this Court had not recognized an impeachment exception to the

collateral-source doctrine.  *See **Busick***, 856 So. 2d at 309 (citing, *e.g.*, *McCollum v.*

*Franklin*, 608 So. 2d 692, 695 (Miss. 1992); *Eaton v. Gilliland*, 537 So. 2d 405, 408 (Miss.

1989); *Cent. Bank of Miss.*, 517 So. 2d at 511; *Star Chevrolet Co. v. Green by Green*, 473

So. 2d 157, 162 (Miss. 1985); *Preferred Risk Mut. Ins. Co. v. Courtney*, 393 So. 2d 1328,

1332-33 (Miss. 1981)).  In *Busick*, this Court noted that several states have recognized a

limited impeachment exception to the collateral-source rule.  *See **Busick***, 856 So. 2d at 309-

10 (citing, *e.g.*, *Warren v. Ballard*, 266 Ga. 408, 467 S.E.2d 891, 893 (1996); *Corsetti v.*

*Stone Co.*, 396 Mass. 1, 483 N.E.2d 793, 801 (1985); *Evans v. Wilson*, 279 Ark. 224, 650

S.W.2d 569, 570 (1983); *Hack v. State Farm Mut. Auto. Ins. Co.*, 37 Wis. 2d 1, 154 N.W.2d

320, 325 (1967)).  There, the:

> evidence related to Busick's health insurance was admitted to *impeach her*
> *testimony* that she suffered permanent injuries as a result of the accident.
> Busick testified that she ceased physical therapy because she could no longer
> afford it.  The fact that she spent only $45 on that therapy discredited her
> testimony.

*Busick*, 856 So. 2d at 310 (emphasis added).  This Court held that "[t]he testimony was not

solicited for the purposes of mitigating her loss or reducing damages owed to Busick."  *Id*.

Therefore, this Court held there was "no reversible error . . . in allowing this testimony with

an appropriate limiting instruction."  *Id*.

7

¶14. While "impeachment exception to the collateral-source rule" has been the terminology used by some courts, that phrase is a bit misleading and may cause confusion. An "exception" is defined as "[o]ne that is excepted, esp. a case not conforming to normal rules." Webster's II New College Dictionary 390 (3d ed. 2001). The "collateral-source rule" is in no way excepted or excluded by the impeachment of testimony. The rule remains unchanged, and a defendant may not use payments received from a third party to mitigate or reduce a plaintiff's damages. *See Coker*, 52 So. 2d at 357. The misnomered "exception" pertains to impeachment of false testimony by evidence of collateral-source payments. Therefore, correctly stated, the issue is whether a defendant may cross-examine the plaintiff regarding collateral-source payments, for the narrow purpose of impeaching false testimony, as approved by the 2003 *Busick* Court. *See Busick*, 856 So. 2d at 310.

¶15. It is a given, requiring no citation, that courts should never condone false testimony. When a witness falsely swears that he or she paid, as opposed to incurred, medical expenses when, in fact, the medical expenses were paid by a third party, the aforementioned principle is violated. Therefore, to the extent that courts of this state have held that evidence of collateral-source payments may not be introduced for the purpose of impeaching false or misleading testimony, those decisions are expressly overruled. *See Corsetti*, 396 Mass. at 17 (quoting *Goldstein v. Gontarz*, 364 Mass. 800, 812 (1974)) ("in some circumstances, evidence of collateral source income may be admissible, in the discretion of the trial judge, 'as probative of a relevant proposition, say 'control' or *credibility of a particular witness*.'") (emphasis in original). Permitting evidence of collateral-source payments for the narrow purpose of impeaching false or misleading testimony is consistent with the Mississippi Rules

8

of Evidence. Rule 607 provides that "[t]he credibility of a witness may be attacked by any party . . . ." Miss. R. Evid. 607. Therefore, an attack upon the credibility of a witness through the impeachment of false or misleading testimony is permissible. However, any evidence to be admitted under Rule 607 must always first be deemed relevant, *see* Mississippi Rule of Evidence 401-402, and then filtered through Rule 403.[2] Moreover, as in **Busick**, granting a limiting instruction may be appropriate, so as to avoid jurors being led "to consider plaintiffs' claims unimportant or trivial or to refuse plaintiffs' verdicts or reduce them, believing that otherwise there would be unjust double recovery." **Corsetti**, 396 Mass. at 17 (quoting **Goldstein**, 364 Mass. at 809).

¶16.    Today's decision also comports with the mandate articulated in our rules of evidence. Rule 102 provides that our rules of evidence shall promote the "growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Miss. R. Evid. 102. The benefits derived from permitting such inquiry are minimally two-fold. First, it eliminates the judicial conundrum of allowing known false testimony to be considered by a jury. Second, it eliminates jury consideration of an illusory element of damages premised on false testimony.

¶17.    We can agree with the separate opinion of Justice Kitchens that evidence of collateral-source payments "is not relevant upon the inquiry as to whether one party has wronged another." (Concurring-In-Result-Only Opinion at ¶ 32). No less true, however, is that the

---

[2]Justice Kitchens's lack of confidence in our trial judges to control the admission of evidence and fears of their "heap[ing] heretofore forbidden evidence" into trial (Concurring-In-Result-Only Opinion at ¶39), is misplaced. Our system of justice is dependent upon trial judges properly applying evidentiary rules.

veracity of any party is relevant, which is the crux of this Court's decision, i.e., the condemnation of false testimony. Justice Kitchens's suggestion that today's decision abrogates the rule is unclear, as the **Busick** Court decided this issue six years ago. *See Busick*, 856 So. 2d at 310. The cases relied upon by Justice Kitchens predate **Busick**. Moreover, **Vance v. Hervey**, 253 Miss. 751, 179 So. 2d 1 (1965), cited in Justice Kitchens's separate opinion, provides additional rationale for permitting evidence of collateral-source payments for the narrow purpose of impeaching false or misleading testimony in **Busick**-type cases. In **Vance**, "[t]he plaintiff was permitted to testify on cross-examination, over the objection of his attorney, that he had received weekly insurance benefits from January 1963 through July 1964 for the first injury, and this is assigned as error." *Id*. at 754. While acknowledging that **Coker** and **Ethridge v. Goyer Company**, 241 Miss. 333, 131 So. 2d 188 (1961), "pronounce sound law," this Court held that:

> they have no application to the case at bar for the reason the plaintiff opened the subject of the industrial or first injury by introducing evidence in regard thereto. He cannot now complain of cross examination on the very matter he has introduced and which extends the evidence to show that compensation payments were made.

*Vance*, 253 Miss. at 755 (citations omitted). *See also* **Crosby v. Keen**, 200 Miss. 590, 593-94, 28 So. 2d 322, 323 (1946) (quoting 31 C.J.S. Evidence, § 190) ("*[t]he party who first introduces improper evidence cannot object to the admission of evidence from the adverse party relating to the same matter*. However, the admission of such evidence is not a matter of absolute right, but rests in the sound discretion of the court . . . .") (emphasis added). False testimony is always improper evidence.

10

¶18.	In the case *sub judice*, the learned circuit judge conducted a very thorough analysis regarding Mitchell's testimony, its putative prejudicial effect upon Robinson Property, and the applicable law. The circuit judge found that, although Mitchell had testified about medical bills, she also had testified about nonmedical expenses. He concluded that he could not "say with confidence that the plaintiff was attributing her financial difficulties directly to her medical bills." As such, the circuit court "did not believe the plaintiff's comment was unduly prejudicial toward the defendant." Additionally, the circuit judge expressed some uncertainty following his analysis of the caselaw on whether to allow impeachment of Mitchell, "find[ing] [him]self without clear guidance."[3] If **Busick**'s failure to overrule prior contrary holdings created any uncertainty, today's decision should make it clear that a witness may, under very limited circumstances, be cross-examined on collateral-source payments. Each case involves a fact-specific inquiry. Under these particular facts, this Court concludes that the circuit court correctly applied the law when it refused to admit evidence of Mitchell's health insurance and Medicare coverage.

**II.	Whether the circuit court abused its discretion in failing to grant Robinson Property's motion for new trial.**

¶19.	This Court reviews the denial of a motion for new trial for abuse of discretion. *See Poole v. Avara*, 908 So. 2d 716, 726 (Miss. 2005). This Court "will not set aside a jury's verdict and order a new trial unless we are convinced that the verdict was contrary to the

---

[3]Specifically, the circuit judge stated, "[h]istorical precedence suggest[s] that there is no impeachment exception to the collateral source rule. However, more recent cases contain language seemingly suggesting that evidence introduced for purposes other than to reduce the monetary award for the plaintiff, such as impeachment, is properly admitted."

substantial weight of the evidence so that justice requires that a new trial be granted." *Id*. at 727 (citing *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 714 (Miss. 1984) (Robertson, J., specially concurring)).

¶20.    In considering a motion for new trial, this Court has set forth the following list of factors that a trial court should weigh and consider:

> (1) Has the search for the true facts proceeded as far as it reasonably may under the peculiar facts and circumstances of the case?
>
> (2) To what extent would it be unfair to the party in whose favor the verdict was returned in effect to give that party's adversary a second bite at the apple?
>
> (3) Considering the evidence, is there a substantial basis for believing that the jury disregarded their oaths and failed to follow the instructions of the Court in reaching its verdict?  Put another way, is it substantially apparent that the jury's verdict is the product of passion, prejudice or any other arbitrary factor?
>
> (4) Assuming arguendo that the verdict is unjust (by reference to the underlying facts of the transaction or occurrence, the complete truth of which we will never know), what is the impact of that "injustice" upon the party against whom the verdict has been returned?
>
> (5) If a new trial is ordered, will the party in whose favor the verdict has been returned be deprived of some fair advantage he enjoyed in the first trial?
>
> (6) Are there any other factors present, peculiar to the particular case or the parties, that would render just or unjust the grant or denial of a new trial?

*Janssen Pharmaceutica, Inc. v. Bailey*, 878 So. 2d 31, 60-61 (Miss. 2004) (citing *Jesco, Inc.*, 451 So. 2d at 715-16)).

¶21.    Robinson Property argues that the circuit judge failed to weigh these factors as a whole.  Primarily, it asserts that, by refusing to admit the evidence of Mitchell's insurance coverage, the circuit court did not permit the "true facts" to proceed as far as reasonably necessary.  *See id*.

12

¶22. The circuit judge entered a thorough order denying Robinson Property's motion for new trial. After examining the relevant caselaw and noting the lack of clear guidance, the circuit judge acknowledged that he could not state with confidence that he was correct in refusing to admit the proposed impeachment evidence.[4] But he added that even if he had erred, a new trial was not required. He found that Mitchell's credibility was substantially impeached by Robinson Property's "vigorous attack" surrounding the "debacle involving the errant $10,000 [in] medical expenses appearing in the plaintiff's medical expense summary . . . ." He also was of the opinion that the size of the verdict compared to the requested medical expenses suggested that Mitchell's credibility had been called into question.

¶23. This Court finds that the circuit court did not abuse its discretion in denying a new trial.

## CONCLUSION

¶24. The circuit court did not err in excluding evidence of Mitchell's insurance payments, nor did it abuse its discretion in denying a new trial. Therefore, this Court affirms the Circuit Court of Tunica County's final judgment and denial of Robinson Property's motion for new trial.

¶25. **AFFIRMED**.

**WALLER, C.J., CARLSON, P.J., DICKINSON, LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY. DICKINSON, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY CARLSON, P.J., RANDOLPH AND LAMAR, JJ. KITCHENS, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION JOINED IN PART BY WALLER, C.J.**

---

[4]*See* footnote 3 *supra*.

13

**DICKINSON, JUSTICE, CONCURRING:**

¶26. I have attempted without success to understand the concern voiced by my learned colleague, Justice Kitchens, who opines that today's majority opinion "makes access to previously forbidden evidence of collateral-source payments exceedingly effortless." I agree with my friend on the point, but hasten to state that, in my judgment, access to such evidence should, indeed, be effortless. After all, it comes into play only where the plaintiff has lied on the witness stand. Our rules – whether of ancient[5] or more recent[6] vintage – should never protect a liar.

¶27. The subject of my friend's concurring opinion is the following issue as framed by Justice Randolph: "Whether a defendant may cross-examine the plaintiff regarding collateral-source payments, for the narrow purpose of impeaching false testimony." One would hope the issue is rarely presented but, when it is, my firm view is that neither rule nor statute nor this Court's precedent should prevent the lie from being exposed.

¶28. Furthermore, I question my friend's prognostication that today's decision will savage cases where plaintiffs make "benign references to financial hardship." That is precisely what happened in the case before us today, and the majority correctly concludes that the plaintiff's testimony was acceptable, and that the trial judge's exclusion of the collateral-source payments was eminently correct.

---

[5]"Ye shall know the truth, and the truth shall make you free." *John* 8:32.

[6]"These rules [of evidence] shall be construed . . . to the end that the truth may be ascertained and proceedings justly determined." Maj. Op. at ¶16 (*citing* Miss. R. Evid. 102).

14

**CARLSON, P.J., RANDOLPH AND LAMAR, JJ., JOIN THIS OPINION.**

**KITCHENS, JUSTICE, CONCURRING IN RESULT ONLY:**

¶29. I agree with the majority that "the circuit court correctly applied the law when it refused to admit evidence of Mitchell's health insurance and Medicare coverage." Maj. Op. at ¶18. But in my judgment, that correct application stemmed from our long-held principle that parties may not adduce evidence that damages have been mitigated by collateral-source payments. I can endorse neither the abrogation nor the weakening of that wise rule. Therefore, I join today's judgment in result only.

¶30. Let us be under no illusions regarding the impact of today's pronouncement. The majority opinion's aim is no "narrow purpose," Maj. Op. at ¶14, and Mississippi's longstanding collateral-source rule does not "remain[ ] unchanged" by today's judgment. *Id.* This decision makes access to previously forbidden evidence of collateral-source payments exceedingly effortless and overlooks major implications that may open the door to the rule's demise.

¶31. As early as 1854, the U.S. Supreme Court recognized the principle, long ago crafted of necessity by English courts, *see **Yates v. Whyte**,* 4 Bing. N.C. 272 (1838), as "a doctrine well established . . . ." ***Monticello v. Mollison***, 58 U.S. 152, 155, 15 L. Ed. 68, 17 How. 152 (1854). "The contract with the insurer is in the nature of a wager between third parties, with which the trespasser has no concern." *Id.*

¶32. The policy considerations girding the collateral-source rule are legion, but perhaps chiefly ranked among them all is the recognition that such evidence simply is not relevant upon the inquiry as to whether one party has wronged another. Until recently, this Court has

held consistently that the collateral-source rule does not yield even to considerations of a witness's veracity. *See Ethridge v. Goyer Co.*, 241 Miss. 333, 338 (1961) (evidence of collateral-source payments not permitted even "to contradict testimony that the plaintiff gave in the trial . . ."). *See also Vance v. Hervey*, 253 Miss. 751, 755 (1965) (rule of *Ethridge* is "sound law").

¶33. To the credit of my colleagues with whose judgment I part ways today, the decision in the instant case does not automatically allow admission of such evidence. Rather, today's judgment purports to grant its blessing only upon "evidence of collateral source payments . . . introduced for the purpose of impeaching false or misleading testimony . . . ." Maj. Op. at ¶17. Were such evidence admissible in a vacuum, then I would concur fully. But any contention that such evidence will not be procured with the intent and effect of informing jurors that a plaintiff's damages were covered by insurance is not rooted in reality. Indeed, one would find impossible the task of suggesting with sincerity that some attorneys will not assiduously ferret out such evidence at every opportunity for precisely that purpose. The majority makes available an outright circumvention of the collateral-source rule with the simple, possibly pretextual, question of whether the plaintiff in any given case has suffered personal financial hardship. If the answer is yes, as it almost always would be, then the examining attorney has positioned his or her client to offer proof of collateral-source payments.

¶34. I find the majority's reliance on our decision in *Busick v. St. John*, 856 So. 2d 304 (Miss. 2003), to be misplaced. In *Busick*, this Court noted the existence of an impeachment exception in some jurisdictions but ultimately avoided the collateral-source issue by correctly

16

noting that the issue had not been preserved for appellate review by way of a timely objection at trial.[7] *Id.* at 309-310. ***Busick*** did not, either explicitly or implicitly, create the rule of law to which the majority purportedly adheres. If ***Busick*** stands for any broadly applicable principle of law at all, it is that evidence of collateral-source payments survives appellate review only when the aggrieved party did not lodge a timely objection thereto. *Id.* at 310.

¶35.    One of the central policy foundations supporting the collateral-source rule is that any alternative would punish parties with the foresight and care to protect themselves and others by carrying health coverage. Today's decision has great potential to punish such foresight.

---

[7] By arguing, on one hand, that today's judgment is rooted firmly in prior precedent but, feeling, on the other hand, the need to overrule prior case law expressly, the majority appears to concede, at the very least, that the relevant language in ***Busick*** on which today's decision rests is not emphatic. I agree. However, whatever direction can be gleaned from the ambiguity strongly suggests that, ultimately, the ***Busick*** Court rejected the encroachment upon the collateral-source rule adopted today. Paragraph 16, in which the ***Busick*** Court spoke its final words regarding the issue now before us, finds no error in the impeachment evidence presented in that case, but that paragraph does not indicate clearly whether the conclusion is reached because of a procedural bar or because of a newly recognized exception. *See id.* at 310. Paragraph 15 is clearer, though. It begins by reiterating Mississippi's long-held recognition that the collateral-source rule stands without exception. Then-Presiding Justice Smith briefly, almost casually, mentioned that some states have recognized this single exception. *Id.* at 309-310. And then, as quickly as it mentioned this point, the majority dropped the issue from its discussion. The ***Busick*** opinion did not suggest that the exception was being adopted, that it should be adopted, or even that existing Mississippi law appeared to support its adoption. Indeed, the only pronouncement of Mississippi law therein was the recognition that this Court has never permitted any exception to the collateral-source rule. *Id.* at 309. Also, to the extent that the ***Busick*** Court found permissible evidence of collateral-source payments, it so found only under the unusual set of facts of that case, in which the plaintiff's attorney asked for a limiting instruction in lieu of requesting a mistrial. *Id.* at 308-09. For these reasons, my view is that the portion of ***Busick*** on which today's majority opinion depends is dictum and limited to that case's facts. I concede that this conclusion alone does not foreclose the Court from proceeding down the trail embarked upon today, but we should at least recognize that we do so without regard for the principles of *stare decisis*.

¶36. This decision also ignores the implications presented by subrogation, which is contractually required by most contemporary health insurance policies and plans, as well as by government programs such as Medicare and Medicaid, and by our state's workers' compensation statute. When all or some portion of a plaintiff's claim-related medical costs have been paid by third parties such as these, a plaintiff who is awarded money damages in civil litigation must reimburse that third party from his or her recovery of those same components of claim-related damages.

¶37. In a trial, it likely would benefit the tortfeasor for jurors to get the impression that the plaintiff was attempting to "double dip" by asking for a verdict that included medical costs already paid on the plaintiff's behalf by a third party, such as the plaintiff's health insurance carrier. For jurors to be so misled, whether unintentionally or otherwise, would be patently unfair, and the prevention of this sort of injustice provides another compelling reason to maintain inviolate Mississippi's well-established collateral-source rule. Justice would best be served by retention, without exception, of this wisely conceived, time-tested rule that precludes jurors from being informed that a plaintiff's medical costs had been defrayed, in whole or in part, through third-party payments, unless, of course, we also should hold that, if a jury were given such information, a plaintiff would then be allowed to make the jurors privy to the realities of subrogation.

¶38. Similarly, it would seem only fair, in the interest of full disclosure, to inform jurors of defendants' applicable liability insurance so that they would know that a defendant would not be caused to suffer personal financial hardship by an adverse verdict. By analogy to today's decision, a plaintiff's attorney could ask a defendant, "Would you suffer personal

18

financial hardship if you had to pay the plaintiff's medical bills, lost income, and other proven damages?" This would open the door to the plaintiff's being able to reveal to the jury that the defendant would be relieved of personally paying those damages because they would be paid by funds from *a collateral source*, namely the defendant's liability insurance carrier, up to the limits of the defendant's applicable coverage. It is apparent that the majority's tinkering with this venerable old rule may have ramifications far beyond its application to the instant case.

¶39.    Even without the policy concerns that support my conclusion, I still would not be comfortable joining this decision because the majority does little to explain how and when evidence of collateral-source payments may be adduced. Notwithstanding the majority's contention that the collateral-source rule "remains unchanged" by its decision, Maj. Op. at ¶14, "the purpose of impeaching false or misleading testimony" at which today's judgment is aimed is an exceedingly vague standard. *Id.* Undoubtedly, some trial courts will apply this new rule narrowly and allow evidence of collateral-source payments only when the plaintiff has stepped squarely in a hole of its own digging. Conversely, other trial judges will enthusiastically leap astride the horse loosed from its stable by today's majority and heap heretofore forbidden evidence upon a plaintiff's most benign references to financial hardship.

¶40.    To the extent that my friends in the majority contend that my conclusion violates evidentiary concerns and Biblical concerns alike, *see* Conc. Op. at ¶26, n.1-2 (Dickinson, J.), my colleagues, for whom I have the deepest respect, have reached their conclusion by way of an oversimplified view of the real-world effects today's decision will have. The Court reaches its conclusion with insufficient consideration of the practical implications thereof,

the inevitable real-world effects thereof in this state's trial courts, and the unfair disadvantage at which plaintiffs are placed thereby. The fullness of today's judgment is a slippery slope upon which I am compelled not to step. Therefore, I concur in its result but nothing more.

**WALLER, C.J., JOINS THIS OPINION IN PART.**